IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2003

## STATE OF TENNESSEE v. DYWAND CARLOS PETTWAY

**Appeal from the Circuit Court for Bedford County**
**No. 15076     Charles Lee, Judge**

---

**No. M2003-00238-CCA-R3-CD - Filed January 23, 2004**

---

A Bedford County Circuit Court jury convicted the defendant, Dywand Carlos Pettway, of aggravated robbery, a Class B felony, and possession of a Schedule II controlled substance, a Class A misdemeanor.  The trial court sentenced him as a Range II offender to twenty years in the Department of Correction for the aggravated robbery conviction and eleven months, twenty-nine days for the possession of a Schedule II controlled substance conviction, to be served consecutively.  In this appeal, the defendant claims (1) that the evidence is insufficient to support his aggravated robbery conviction and (2) that his sentences are excessive.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Donna Leigh Hargrove, District Public Defender, and Curtis H. Gann, Assistant Public Defender (on appeal) and Andrew Jackson Dearing, III, Assistant Public Defender (at trial), for the appellant, Dywand Carlos Pettway.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William Michael McCown, District Attorney General; and Michael David Randles and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from the beating and robbery of William Lanier on February 8, 2002.  The victim testified that in February 2002, he worked at Tyson Foods from 8:00 a.m. until 3:30 p.m. and that he worked at Eaton from 4:30 p.m. until 11:30 p.m.  He said that his car was not working during this time and that he usually either walked or called a taxi to get to work.  He said he was living in room 110 at the Bedford Motel.  He said that on February 7, Diane Pettway, the defendant's wife, asked him for money but that he declined, telling her that he would not have any money until he was

paid the following day. He said he asked her why she could not get the money she needed from her husband. He said that on February 8, he was on vacation from his job at Tyson Foods and did not pick up his paycheck until around 11:00 a.m. He said that after picking up his check, he cashed it at a local convenience store and that when he arrived home, he called a taxi to take him to his job at Eaton. He said that the defendant came from his motel room and told the victim that the defendant's wife could give him a ride to work and that he accepted the defendant's offer.

The victim testified that after arriving home from work that evening, the defendant knocked on his door and asked how he was doing. He said that he replied he was tired and that the defendant left. He said that ten minutes later, he heard a second knock on the door and that when he opened the door, the defendant entered his apartment. He said that the defendant tried to hit him with a tire iron but that he ducked. He said the defendant began choking him, telling him to die. He said that while the defendant choked him, the defendant said he wanted five hundred dollars. He said that he told the defendant the money was in his coat pocket and that he passed out after answering the defendant's question. He said that after regaining consciousness, he tried to dial 9-1-1 but was unsuccessful. He said he heard a car horn and saw his friend, David Draine, outside his motel room. He said he told Draine that the man in room 112 had robbed him. He said Draine took him to the hospital where he stayed for two days. The victim said he identified the defendant as the person who robbed him when he was shown a photograph array by the police. He said that before the beating, he had $314 dollars in his front right pocket but that afterwards, he was missing his money, wallet, and keys. He said the defendant was the person who had beaten him and taken his money.

On cross-examination, the victim testified that the defendant and Mrs. Pettway had asked to borrow money from him on several occasions but that he had refused each request. He said he gave Mrs. Pettway five dollars for taking him to work on February 8. He said he did not buy crack cocaine three times that day and denied he had ever bought crack cocaine for Mrs. Pettway, stating he had never smoked or even seen crack cocaine. He denied that he offered Mrs. Pettway crack cocaine in exchange for sex and he denied that the defendant asked him what was going on between the victim and the defendant's wife when the defendant confronted him. He said that his keys and money were in his front right pocket but that he did not know when his wallet was taken during the incident with the defendant. He said that during the struggle with the defendant, he was unable to hit the defendant. He said he never heard the phone ring after the defendant had robbed him. He said he was not drinking on the day of the incident.

David Draine testified that the victim was his friend and that he would call the victim periodically to check on him and to see if he needed a ride. He said that he called the victim's room twice on February 8 and that no one answered the phone the first time he called. He said that when he called a second time, someone other than the victim answered and called himself "Mustaffa." He said Mustaffa stated that the victim had left the room for a minute. He said he believed something was wrong because the victim would never let someone stay at his place when the victim was not there. He said that he hurried to the victim's motel room and that when he arrived, the victim came out of his room. He said that the victim was bloody, that his face was swollen, and that he was staggering and wobbling as he came toward him. He said that the victim told him that the man who

lived next door had robbed him using a tire iron and that he needed to go to the hospital. He said that after taking the victim to the hospital, he returned to the Bedford Motel and that he saw a green car and two police cars in the motel's parking lot. He said he identified the defendant's voice as the voice that called himself Mustaffa on the phone. On cross-examination, Draine testified that when he entered the victim's motel room after taking the victim to the hospital, he found the victim's wallet in the room.

Trey Clanton, a lieutenant for the Shelbyville Police Department, testified that he saw the victim at the emergency room on February 8, that the victim's eyes were swollen, and that he had a cut on the back of his head. He said that he went to the Bedford Motel where he saw a green Oldsmobile that had a tire iron on the floorboard of the back seat. He said that he knocked on room 112's door and that the defendant and Mrs. Pettway answered. He said the defendant denied having had anything to do with beating the victim and said he did not know the victim. He said he saw a red spot on the defendant's pants. He said the defendant told him that the green car parked outside was his. He said he found two sets of keys in the defendant's jacket; one set was a motel key for room 110 and the other was a set of car keys. He said that what appeared to be rock cocaine was found in the defendant's bathroom and that the defendant told the police that the crack cocaine was his. He said that they took $147 dollars from the defendant. On cross-examination, Clanton testified that the defendant gave permission for the police to search his car and motel room. He said the victim's wallet was found in room 110 underneath the covers. He acknowledged the tire iron was in plain view in the defendant's car. He said that there was no blood on the money that he took from the defendant and that there was no other money found in the defendant's room. He said that when the defendant was at the police station, the defendant said he and the victim had a fight about the victim smoking crack cocaine with the defendant's wife.

Jason Scott Williams, a sergeant for the Shelbyville Police Department, testified that on February 9, he received a call to go to room 110 at the Bedford Motel. He said that when he arrived, the room was messy and in disarray. He said that he later interviewed the defendant and that the defendant told him that he confronted the victim because the victim smoked crack cocaine with the defendant's wife. He said the defendant told him that he struck and choked the victim. He said that the victim had identified the defendant in a photograph array and that he said the defendant had robbed him. Amy Kaderi, the plant manager at Tyson Foods in Shelbyville, testified that Tyson Foods issued a payroll check to the victim on February 8 for $683.79 dollars.

James E. Smith, the defendant's employer, testified that he picked the defendant up for work around 7:30 a.m. and drove him home at about 4:30 p.m. on February 8. He said he paid the defendant two hundred dollars in cash.

Diane Pettway testified that on February 8, she went to the victim's motel room and that he told her he had some crack cocaine and asked her if she wanted some. She said she and the victim smoked all the crack cocaine that the victim had. She said the victim bought crack cocaine three more times that day from a woman she did not know, paying about one hundred dollars each time. She said that the victim asked her for sexual favors in exchange for the crack cocaine. She said they

smoked crack cocaine from about 1:00 p.m. until around 5:00 p.m. She said she and the defendant later got into an argument because she was high and because the victim had tried to engage in sexual activities with her. She said the defendant was upset and went outside and sat in his car. She said the crack cocaine that the police found in the bathroom was hers.

On cross-examination, Mrs. Pettway testified that she had smoked crack cocaine with the victim earlier that week but that the defendant was not aware that she was smoking crack cocaine with the victim at that time. She said her child was asleep in her motel room while she was smoking crack cocaine with the victim. She acknowledged that in her statement to the police on February 8, she wrote that she and the defendant had been arguing for a couple days. She acknowledged she did not write anywhere in her statement that she was arguing with the defendant because she had been smoking crack cocaine with the victim. She acknowledged that in her written statement she had written that the defendant sometimes called himself Mustaffa.

The defendant testified that Mr. Smith paid him two hundred dollars on February 8. He said that when he arrived at his motel room after work at 4:30 p.m., he saw the victim waiting for a taxi and asked him if he needed a ride to work. He said that the victim replied yes and that he told Mrs. Pettway to give the victim a ride. He said that after his wife returned from giving the victim a ride, he noticed she was high and said he became upset. He said he went to a convenience store and to McDonald's and sat in his car in order to calm down. He said that while he was sitting in his car, he saw the victim enter his motel room and that he followed the victim in order to confront him. He said that the victim opened his door and let him come inside. He said that the victim denied that he had smoked crack cocaine with Mrs. Pettway and denied that he had asked her for sexual favors. He said he was leaving the victim's motel room when the victim pushed him. He said that a fight ensued but that he never hit the victim with a tire iron. He said he answered the victim's telephone the second time it rang while he was in the victim's motel room. He said that the money that the police took from him was the money he received from work that day and that he did not rob the victim.

On cross-examination, the defendant testified that he bought chicken tenders, White Castle hamburgers, candy, corn chips, and cigarettes while he was at the convenience store and that he bought a meal at McDonald's. He said he spent fifty-three dollars on these items, leaving him with $147 dollars, the amount that the police took from him. He said the victim lied about what happened during their altercation. He said, however, that he had lied to the person who called on the telephone for the victim when he told that person the victim was not there and that he had lied when Lieutenant Clanton asked him initially if he was involved in the incident involving the victim. He said that when the police found crack cocaine in his bathroom, he never told Officer Rick Gann that the crack cocaine was his. He said that after he had paid rent, he would have had seventeen dollars for the next week. He said he mistakenly took the victim's room and car keys after the fight and denied that he took the keys from the victim's pocket. The jury convicted the defendant of aggravated robbery and simple possession of a Schedule II controlled substance.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction for aggravated robbery because the state failed to present enough credible testimony to establish guilt beyond a reasonable doubt. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when accomplished with a deadly weapon. T.C.A. §§ 39-13-401(a), -402(a)(1). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" T.C.A. § 39-11-106(a)(5)(B).

Taking the evidence in the light most favorable to the state, the defendant went to the victim's motel room because he needed money and intended to rob the victim of the money the victim had received that day from his paycheck. The defendant admitted that he hit the victim. The victim testified that the defendant asked him where five hundred dollars was while he was beating the victim and that he was missing $314 dollars after the defendant hit him with a tire iron and choked him into unconsciousness. The victim was hospitalized for two days as a result of the defendant's attack. When the police were at the defendant's motel room after the incident, they retrieved $147 dollars from the defendant and found the victim's room key and car key in the defendant's jacket. In the bathroom, the police found crack cocaine and the defendant admitted it was his at that time. The jury could rationally conclude beyond a reasonable doubt that the victim did not participate in the "fight," but, instead, the defendant attacked the victim with the tire iron and robbed the victim of his money. The jury heard the defendant's theory of the case but chose to believe the testimony of the victim and the police officers, who supported the state's theory of the case. The defendant is not entitled to relief on this issue.

# II. SENTENCING

The defendant contends that the trial court improperly sentenced him to sentences of twenty years for aggravated robbery and eleven months, twenty-nine days for possession of a Schedule II controlled substance, to be served consecutively. The state contends that the trial court properly sentenced the defendant. We believe that the defendant's sentences are proper.

At the sentencing hearing, the defendant testified that he was thirty-four years old, had no drug or alcohol problems, and was in the military for two years before being honorably discharged. He continued to deny that he robbed the victim. On cross-examination, he acknowledged that he did not pay child support for his children. He acknowledged that in 1994, a jury convicted him of robbery and aggravated robbery and that he pled guilty to theft of property valued over one thousand dollars but less than ten thousand dollars. He said the jury convictions arose from his robbery of two convenience stores in order that he could get high.

The presentence report reflects that the defendant has three children, has graduated from high school, but has never had continuous employment. It shows that the defendant said he had used marijuana since he was thirteen years old. The report shows that the defendant said he was in excellent health but that he had never participated in a drug or alcohol treatment program. It shows that he has several prior convictions, including two for robbery, two for theft, one for driving with a suspended license, and one for aggravated assault.

The trial court classified the defendant as a Range II offender based upon his prior felony convictions. See T.C.A. § 40-35-106. The trial court noted that the defendant's sentence for the aggravated robbery conviction would be between twelve and twenty years. See T.C.A. § 40-35-112(b)(2). The trial court determined that enhancement factor (1), that the defendant has a prior history of criminal behavior in addition to that necessary to establish the appropriate range, applied to enhance his sentence and carried great weight. See T.C.A. § 40-35-114(1) (Supp. 2001) (amended 2002).[1] In addition, the court applied enhancement factor (5), that the defendant treated the victim with exceptional cruelty, to his aggravated robbery conviction. See T.C.A. § 40-35-114(5) (Supp. 2001) (amended 2002). It finally applied enhancement factors (6), that the injuries inflicted on the victim were particularly great, and (13), that the offense was committed while the defendant was on parole. See T.C.A. § 40-35-114(6), (13)(B) (Supp. 2001) (amended 2002).

The trial court also determined that no mitigating factors applied, rejecting the defendant's claim that factor (11), that the defendant committed the crime under such unusual circumstances that it is unlikely he had a sustained intent to violate the law, should apply. See T.C.A. § 40-35-113(11). The trial court sentenced the defendant to the maximum in the range, twenty years, for the aggravated robbery conviction. It sentenced the defendant to eleven months, twenty-nine days for the possession of a Schedule II controlled substance conviction, and ordered that he serve the sentences consecutively. The trial court found that the defendant's extensive criminal history and the fact that he is a dangerous offender justified his serving the twenty-year sentence consecutively to the eleven month, twenty-nine-day sentence. See T.C.A. § 40-35-115(b)(2), (4).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission

---

[1] The legislature's 2002 amendment to T.C.A. § 40-35-114, effective July 4, 2002, added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only by increasing their designating number by one. Thus, enhancement factor (1) as used in this opinion is presently factor (2).

Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

The sentence to be imposed by the trial court is presumptively the minimum in the range for a Class B felony unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

The defendant claims that his crime was not one of "such huge dimensions" that would justify the trial court's sentence under the "totality of the circumstances." We believe the trial court properly sentenced the defendant. We believe that application of enhancement factors regarding (1) the defendant's previous criminal history, (5) the defendant's cruelty toward the victim, (6) the great injuries inflicted on the victim, and (13) the defendant being on parole, justify the defendant's twenty-year sentence for aggravated robbery. T.C.A. § 40-35-114(1), (5), (6), (13) (Supp. 2001)

(amended 2002). The defendant had committed similar felonies in the past, and the victim suffered serious injuries as a result of the defendant's robbery of him. We also note that the defendant's prior robberies weigh against the application of mitigating factor (11). See T.C.A. § 40-35-113(11). Finally, the defendant has an extensive criminal history that justifies the trial court's ordering him to serve his twenty-year sentence and eleven month, twenty-nine-day sentence consecutively pursuant to T.C.A. § 40-35-115(b)(2). The evidence supports the trial court's application of enhancement factors (1), (5), (6), and (13) and justifies the great weight it afforded factor (1). The maximum twenty-year sentence imposed by the trial court is not excessive.

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE